UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. CR17-5213RBL |
| Plaintiff, | ORDER ON DEFENDANT'S MOTION TO RECONSIDER JUDGMENT ON SUPERVISED RELEASE VIOLATION |
| v. | |
| AARON DALE CARVER, | |
| Defendant. | |

THIS MATTER is before the Court on Defendant's Motion to Reconsider Judgment on

Supervised Release Violation [Dkt. #47]. For the following reasons, the motion is **DENIED**.

**I. FACTS**

In July 2019, Defendant Carver was living with his girlfriend, Rebecca Glenn, who was

working on her recovery from methamphetamine addiction. Glenn was attending intensive

outpatient (IOP) classes with a circle of supportive classmates. One of these classmates was a

man who could not drive. Glenn occasionally drove him to class. When Glenn told Carver about

the rides, he became increasingly bothered. Glenn therefore agreed not to give her classmate any

rides in the future.

1       On the evening of July 11, 2019, while Glenn was at her IOP class, Carver's anger spilled

2 over. First, Carver texted Glenn approximately 24 times. He then drove to Glenn's class and

3 confronted her in the parking lot during one of her class breaks. In Glenn's description, "he was

4 breathing really heavy . . . . He was kind of sweating, actually." Carver accused Glenn of flirting

5 with her classmate and disparaging him.  When Glenn tried to end the conversation so that she

6 could go back into class, Carver left with her phone.

7       That evening, after seeking assistance from her father and her friends, Glenn eventually

8 decided to return to the residence she shared with Carver. She arrived just after midnight, in the

9 early morning of July 12.  When she arrived, Carver again confronted her and ordered her to give

10 him the keys to her car.  He then struck her in the face with a closed fist.

11       After the punch, Carver was distracted with a call to Glenn's father. As Carver later

12 testified, he left a voice message with her father bragging about beating up his "parasite

13 daughter."  Carver also threatened to kill Glenn's father by burning down his trailer with him

14 inside of it.

15       While Carver was so distracted, Glenn made a run for it, heading to the nearest neighbor

16 who happened to be Carver's father, Wayne Carver. Carver took off after her. When Glenn

17 reached Wayne Carver's house, Wayne Carver let her in, and she locked herself in his bathroom.

18 Wayne Carver also let his son in, and Carver stood outside the bathroom where he threatened

19 her: "You're lucky I didn't kill you," Carver said.  When Glenn remained in the locked

20 bathroom, Carver eventually gave up and returned to his house. Wayne Carver then ordered

21 Glenn to leave.

22       After leaving Wayne Carver's house, Glenn ran into some nearby woods to hide, still

23 fearful of Carver. Without a phone or access to her home, she was unable to call for any help.

24

1  While she was hiding, she heard two vehicles. They were police vehicles, and when Glenn got

2  their attention, they offered her assistance.  These events led to charges of violations of

3  conditions of supervised release against Carver.

4  　　　　Following the assault on July 12, while the supervision violations were pending, Carver

5  emailed Glenn with an affidavit for her to sign in violation of a local no-contact order.  The

6  draft affidavit claimed Glenn was under the effects of emotional duress and various

7  medications and therefore was not a credible witness. The affidavit denied the assault or any

8  threats.  Carver hinted that he would give her title to her car if she signed the affidavit.

9  　　　　　　　　　　　　**II. PROCEDURAL HISTORY**

10  　　　　On July 12, 2019, Probation issued a violation report alleging assault in the fourth

11  degree-domestic violence, interfering with domestic violence reporting, and threats to kill. On

12  July 29, 2019, Probation alleged supplemental violations for no-contact order violations.

13  Probation also submitted a Sentencing Recommendation in which it identified the no-contact

14  order violation as felony, thus leading to a Class B violation of supervision. Based on that

15  conclusion, Probation calculated the Guidelines range as 18 to 24 months.

16  　　　　On July 31, 2019, the Court held an evidentiary hearing on the violations. It found that

17  the government proved the alleged violations of DV assault and the no-contact order violation.

18  Without any objection to Probation's calculation or any calculation of its own, the Court

19  sentenced Carver to ten months in custody.

20  　　　　On August 7, 2019, Carver filed a timely Notice of Appeal. On October 24, 2019, while

21  his appeal was pending, Carver filed the present Motion to Reconsider.

22  　　　　Because the Judgment is final, the Court has no jurisdiction over this matter absent a

23  motion under 28 U.S.C. § 2255.  But even if the Court had jurisdiction, the substance of the

24

1    motion is still insufficient: it misstates the effect of a missing Guidelines calculation and it

2    misapplies *United States v. Haymond*, 139 S. Ct. 2369 (2019) to this circumstance.

3                                              **III. DISCUSSION**

4           Because the supervision violations in the Judgment in this case were misdemeanor

5    offenses, Carver argues that he should have had a Grade C violation with a resulting Guidelines

6    range of 7 to 13 months.  He further argues that Probation improperly offered a range of 18 to 24

7    months based on Grade B violations for offenses that would be punishable as felonies under state

8    law.  He argues this is reversible error.  Carver's argument fails because he took the stand and

9    admitted to felony conduct, all of which the Court considered in determining the grade of

10   violation.

11          Carver can only speculate that the Court's Guidelines calculation would have led to a

12   shorter sentence because the Court could have adopted Probation's calculation based on Carver's

13   actual conduct, which amounted to Grade B violations. Carver took the stand and admitted to

14   felony-conduct in the course of the offense, including Harassment with Threats to Kill, a class C

15   felony under RCW 9A.46.020(2)(b), and Witness Tampering, a class C felony under RCW

16   9A.72.120.

17          In choosing the proper grade of violation, the Court was obligated to make its

18   determination "based on the defendant's actual conduct," as USSG § 7B1.2, Commentary Note 1

19   provides. The Court was obligated to look beyond the listed violations to the conduct that Carver

20   admitted on the stand, just as the Court does in calculating the Guidelines for new charges.

21          Because Carver's actual conduct supported a range of 18 to 24 months, the harm from the

22   missing calculation is speculative and is therefore rejected.

23

24

1    Carver has invited the Court to make new law in applying *Apprendi v. New Jersey*, 530

2    U.S. 466 (2000), by requiring a jury finding for any fact that raises a minimum sentence, to

3    supervised release violations pursuant to the much narrower plurality opinion in *United States*

4    *v. Haymond*, 139 S. Ct. 2369 (2019).  Looking at the very reasoning from *Haymond*, the Court

5    does not apply it here.

6         In *Haymond*, the Court held in a 4-1-4 split decision that 18 U.S.C. § 3583(k)—the

7    provision that imposes a five-year mandatory minimum on certain sex offenders who violate

8    supervision by committing enumerated sex crimes—violates the Fifth and Sixth Amendment.

9    Justice Gorsuch, writing for four of the Justices, applied *Alleyne v. United States*, 570 U.S. 99

10   (2013), and its requirement for a jury finding for any fact that raises a minimum sentence.

11   *Haymond*, 139 S. Ct. at 2378.   These four Justices were silent on whether *Apprendi's*

12   requirement of jury findings to raise the maximum sentence is applicable in supervision

13   violations.  But Justice Breyer, who wrote a separate concurring opinion, stated very clearly

14   that *Apprendi* does *not* apply "in light of the potentially destabilizing consequences, I would

15   not transplant the *Apprendi* line of cases to the supervised-release context."  *Id.* at 2385.

16        In concurring on the unconstitutionality of 3583(k), Justice Breyer began with the

17   principle, still in effect, that revocation of supervision is "part of the penalty for the initial

18   offense."  *Id.* at 2386 (quoting *Johnson v. United States*, 529 U.S. 694 (2000)).  But as Justice

19   Breyer reasoned, 3583(k) was more like a new criminal charge than a typical revocation:  first,

20   it applies only when a defendant commits a new criminal offense in violation of specific federal

21   statutes; second, it removed the judge's sentencing discretion; third, it imposed a mandatory

22   five-year term. *Haymond*, 139 S. Ct. at 2386.

23

24

Here, none of the factors that concerned Justice Breyer applies. The violations do not relate to any enumerated federal offenses, and the Court maintained full sentencing discretion at its July 31 hearing. Because this was an ordinary revocation, the *Johnson*'a principle, that the revocation is an extension of the penalty for the initial offense, applies. As such, a separate jury finding is not necessary.

## IV. CONCLUSION

Carver punched his girlfriend and made threats to kill her and her father. He also attempted to change her testimony while charges were pending. The Court sentenced Carver to something less than a Guidelines sentence. There is no need, in law or common sense, to reconsider the Judgment. The Motion is **DENIED**.

IT IS SO ORDERED.

Dated this 3rd day of December, 2019.

Ronald B. Leighton
United States District Judge